IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVY VAN DE SANDE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 05 CV 1182 |
| | ) | |
| JENNIFER SOVSKY VAN DE SANDE, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

On February 28, 2005, Petitioner Davy Van de Sande ("Davy"), a Belgium national, initiated this action against his wife Jennifer Sovsky Van de Sande ("Jennifer"), an American citizen, seeking the return of his minor children pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§11601 *et seq.*, the federal statute implementing the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980). This matter is here following remand and reassignment to the Court. The Seventh Circuit directed the Court to conduct an evidentiary hearing to resolve the merits of the Petition. Despite having notice of the hearing, Davy failed to appear,[1] and,

---

[1] During the parties' extensive mediation efforts following remand, Jennifer temporarily turned over custody to Davy in Belgium pursuant to an agreed order. (R. 96-1, Order of Apr. 12, 2006.) Davy, however, refused to comply with the Court-ordered return date of August 8, 2006. Davy continues to maintain custody of the children, and, in recent weeks, he has unequivocally indicated to his counsel and Jennifer that, because he maintains custody, he no longer intends to participate in this litigation. (*See* Tr. of Jan. 10, 2008; R. 163-1, Motion to Withdraw.) As discussed more fully below, this conduct effects a waiver of the opportunity to present evidence in support of the Petition.

-1-

accordingly, Jennifer opted to submit affidavits in lieu of live testimony.  Pursuant to Federal Rule of Civil Procedure 52, the Court has evaluated the current record and concludes, for the reasons below, that the Petition fails on the merits.  Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."); *see also Eirhart v. Libbey-Owens-Ford Co.*, 996 F.2d 837, 840 (7th Cir. 1993) ("Rule 52 allows for matters to be tried to the district court on a written record; we do not read the Rule to require that an evidentiary hearing be held." (citing authorities)).

## FINDINGS OF FACT

**I.    The Custody Dispute**

Davy is a citizen and national of Belgium and currently lives at Wouwerhoeve 44, 2430 Laakdal, Belgium.  (R. 163-1, Motion to Withdraw; R. 1-1, Verified Petition ("Petition") at ¶5.)  Jennifer is a citizen and national of the United States and currently lives in Ingleside, Illinois, 60041.  (R. 174-1, Respondent Aff. at ¶1.)  Davy and Jennifer are the parents of Kaitlynn Marie Van de Sande ("Kaitlynn"), a minor child who was born in Libertyville, Illinois on August 13, 2000 and Brandon William Van De Sande ("Brandon"), a minor child who was born in Diest, Belgium on January 20, 2003.  (R. 174-1, Respondent Aff. at ¶3; R. 1-1, Petition at ¶7.)  The two children are the subject of the Petition.

Davy and Jennifer wed on November 30, 1999 in Waukegan, Illinois and thereafter lived together with Jennifer's parents in Ingleside, Illinois.  (R. 174-1, Respondent Aff. at ¶6.)  Beginning two weeks after they were married and continuing until their separation in October

2004, Davy regularly and continually abused Jennifer physically and verbally. (*Id.* at ¶7.) Davy's beatings of Jennifer were frequent (occurring several times per week) and extreme. (*Id.* at ¶¶7, 13, 14, 16-18, 23, 25-30, 36.) Jennifer recounts multiple incidents where Davy has slammed her head against the wall, choked her, kicked her, kneed her, and punched her. (*Id.*) Davy even beat Jennifer while Jennifer was pregnant. (*Id.* at ¶¶7, 16.) For example, when Jennifer was seven months pregnant with Kaitlynn, Davy slammed Jennifer's head against a wall, choked her, and pushed her toward the top of a flight of stairs, threatening to topple her down them. (*Id.* at ¶7.) Jennifer's friend, Heather Anderson, witnessed this attack and provides a vivid description of the event:

> On one evening in May or June, 2000, I was at the Sovksy residence. . . and saw Davy Van de Sande rush at Jennifer Van de Sande, put his right hand around her throat, and slam her against a wall, bouncing her head against the wall. When Jennifer's body hit the wall, a big picture hanging on the wall bounced and became crooked.
>
> At that time, I was sitting at the dining room table. I said to Davy: "Get your hands off her. She's seven months pregnant. If you want to hit someone, hit me." He then took two steps toward me, raising his right hand and coming right up close to me. I then stood up and said: "Why don't you hit me, motherfucker. Show me how big a man you are." Davy said: "You're not the one pissing me off, stay the fuck out of this." I sat down. Then he turned around, lunged at Jennifer with his hand drawn back as if to strike her, and I jumped up again and approached them. Davy put his hands on Jennifer's shoulders and shoved her toward a flight of stairs leading to a lower floor. I grabbed Davy's shirt and pulled on it, and then grabbed Jennifer by the shirt to prevent her from going down the stairs. Davy said to me: "Fuck you bitch, you're not welcome in this house" and ran down the stairs.

(R. 20-1, Resp. to Summ. J., Ex. 1b at ¶¶6, 7 (Aff. of H. Anderson).) Davy also verbally abused Jennifer, often calling Jennifer a "cunt", a "whore", a "lazy fucking bitch", and a "stupid bitch." (R. 174-1, Respondent Aff. at ¶¶39, 41, 44; R. 20-1, Resp. to Summ. J., Ex. 1b at ¶10, Ex. 1c (Aff. of S. Sovsky) at ¶8, Ex. 1d (Aff. of R. Sovsky) at ¶6.) And, on at least one occasion, Davy has told their daughter "Fuck mommy," and has directed her to "[t]ell Mommy she's a cunt."

-3-

(R. 174-1, Respondent Aff. at ¶44; R. 20-1, Resp. to Summ. J., Ex. 1c at ¶8, Ex. 1d at ¶8, Ex. 1e (Aff. of Jayson Sovsky) at ¶¶7, 9.)

In late 2000, Davy floated the idea of moving back to Belgium, so that he could attend a free college program. (R. 174-1, Respondent Aff. at ¶8.) Jennifer was reluctant; she had no family there, no friends, no job, and did not speak the language well. (R. 174-1, Respondent Aff. at ¶9.) To encourage Jennifer, Davy promised that, as soon as he completed college in Belgium, the family would move back to Illinois. (R. 174-1, Respondent Aff. at ¶¶8, 10; R. 20-1, Resp. to Summ. J., Ex 1c at ¶14, Ex. 1d at ¶10.) Davy made this promise on several occasions to Jennifer and in the presence of her family, including her mother, father, and brothers. (*Id.*) On January 24, 2001, Davy, Jennifer, and Kaitlynn moved in with Davy's mother in Laakdal, Belgium. (R. 174-1, Respondent Aff. at ¶11.) Once there, Davy continued to tell Jennifer that they would return to the United States as soon as he was finished with school. (*Id.*).

After the move to Belgium, Davy continued to beat Jennifer. (*Id.* at ¶¶13, 14, 16, 23, 25-29.) Davy's mother also joined in the beatings for the supposed reason that Jennifer was an indifferent housekeeper. (*Id.* at ¶¶17, 30.) Jennifer secretly called the Belgium police several times when Davy beat her, but they said they could do nothing unless she went to a doctor to verify her injuries, which she did not do for fear of increasing the severity of Davy's beatings. (*Id.* at ¶31.)

Davy also physically abused Kaitlynn. (*See, e.g.,* R. 174-1, Respondent Aff. at ¶¶20, 21, 26.) *See also Van De Sande v. Van De Sande*, 431 F.3d 567, 569 (7th Cir. 2005) (construing the supplied affidavits to that effect). The abuse began when Kaitlynn started wetting her bed. (R. 174-1, Respondent Aff. at ¶¶20, 21.) Davy would spank her repeatedly, and on one occassion,

when Jennifer entered Kaitlynn's bedroom and told Davy to stop beating their daughter, he grabbed Jennifer by the throat and shoved her out of the room. (*Id.* at ¶26.) And, at least once, Davy delivered a sharp blow to the side of Kaitlynn's head; Davy's mother also has struck Kaitlynn in the head. (*Id*. at ¶¶22, 37.)

On September 29, 2004, Davy and Jennifer returned to the United States to attend Jennifer's brother's wedding. (*Id.* at ¶35.) Davy struck Jennifer in the face and choked her several times during their stay. (*Id.* at ¶36.)

On October 9, 2004, while still in the United States, Jennifer took Kaitlynn and Brandon and their passports to her brother's house. (R. 174-1, Respondent Aff. at ¶38.) While Jennifer and the children were out of the home, Jennifer's father, Raymond, told Davy that Jennifer and the children planned to stay in the United States and therefore would not be returning to Belgium. (*Id.* at ¶38.) In a later conversation with Jennifer, Davy threatened to kill the children, saying: "If I can't have my kids, I might as well find a gun and kill him." (*Id.* at ¶40.) He then threatened that he would "kill everybody" if his children did not return with him to Belgium. (R. 20-1, Resp. to Summ. J., Ex. 1e at ¶10.) After telling her father about Davy's threats, Raymond called the police, and an officer escorted Davy from the house. (R. 174-1, Respondent Aff. at ¶41; *see also* R. 172-1, Aff. of Dep. E. Campbell at ¶¶2, 8 (an affidavit of the responding officer averring that Davy acknowledged making these threats: "While Raymond and Davy were both in my presence, Raymond asked Davy, 'Did you threaten to kill the kids if you don't get them?' Davy replied, 'Yes, I said that.'").) Davy returned to Belgium on approximately October 12, 2004. (*Id.* at ¶42.)

## II. The Current Litigation

Once back in Belgium, Davy filed an application for custody of Kaitlynn and Brandon with the Belgian authorities. (*Id.*) Pursuant to his application, on October 18, 2004, the President of the Court of First Instance in Turnhout, Belgium, granted Davy relief including an award of exclusive custodial rights over Kaitlynn and Brandon. (R. 1-1, Petition at ¶14.) On October 22, 2004, Davy submitted requests for the return of his children to the Belgian Central Authority with responsibility for implementing the Hague Convention. (*Id.* at ¶15.) On February 25, 2005, Davy filed the petition initiating the current matter.

On June 16, 2005, the district court granted Davy's Motion for Summary Judgment and ordered that the children be returned to Belgium. (R. 33-3, Mem. Op. and Order.) Jennifer appealed that decision and, on December 7, 2005, the Seventh Circuit reversed and remanded for an evidentiary hearing on the Petition:

> [T]he safety of children is paramount. Jennifer presented at the summary judgment stage sufficient evidence of a grave risk of harm to her children, and the adequacy of conditions that would protect the children if they were returned to their father's country is sufficiently in doubt, to necessitate an evidentiary hearing in order to explore these issues fully. The hearing should be held promptly and conducted expeditiously in order to comply with the Convention's goal of expediting the return of abducted children to their country of habitual residence, provided that the return will not expose the children to a grave risk of harm.

*Van De Sande*, 431 F.3d at 572. On remand, the case was reassigned to this Court pursuant to Circuit Rule 36.

Following remand, the Court delayed the evidentiary hearing at the parties' request. The parties agreed to continue the evidentiary hearing in order to proceed first to mediation before the assigned magistrate judge and an independent mediator specializing in family issues.

Mediation offered short-lived cause for optimism. As a result of the mediation, the

parties reached an interim agreement. Consequently, on April 12, 2006, the Court entered an agreed order, providing: (1) that Davy would be allowed to take Kaitlynn and Brandon to Belgium, so long as Davy returned the children to Jennifer's custody in Illinois no later than August 8, 2006; and (2) that while in Belgium Davy would go to the Belgian court that had considered his custody application, advise the Belgian court of the proceedings in the United States, and ask the Belgian court for a continuance until after September 2006, when the hearing on Davy's Petition in this Court was scheduled. (R. 96-1, Order of Apr. 12, 2006.)

Since mid-July 2006, however, Davy has repeatedly informed his counsel and Jennifer that he did not and does not intend to return the children to the United States. (R. 100-1, Motion to Withdraw; R. 163-1, Renewed Motion to Withdraw.)[2] Further, in June 2006, Davy appeared before the Belgian court as agreed, but rather than seeking a continuance and advising the court of the proceedings in the United States, Davy instead obtained a court order that further confirmed his sole custody of the children. (R. 174-1, Respondent Aff. at ¶46.)

Notwithstanding Davy's disregard for the Court's order, the parties continued mediation sessions, with Davy participating by telephone from Belgium. (*Id.* at ¶49.) Throughout the mediation process, Davy allowed Jennifer to have limited contact with the children through webcam visits and telephone calls. (*Id.* at ¶50.) But shortly after the parties terminated mediation on January 3, 2008, Davy told Jennifer through an instant message exchange that he was cutting off her contact with the children and that she "can go fuck herself and die":

    jennifer jennifer: hi

---

[2] After learning of Davy's intention to disregard the Court's order, Davy's attorney moved to withdraw from representation. (R. 100-1, Motion to Withdraw.) The Court denied that request without prejudice.

> jennifer jennifer: ready?
> jennifer jennifer: are you there?
> dave_vds: sure
> dave_vds: why do i need to be ready?
> jennifer jennifer: k
> jennifer jennifer: so i may see the children
> dave_vds: don't think so
> jennifer jennifer: ok are you saying i may not?
> dave_vds: I am definitely saying you can go fuck yourself and die
> dave_vds: Don't even think about seeing the children lol
> dave_vds: We do not have any legal agreement
> dave_vds: bye
> jennifer jennifer: ok have good one
> jennifer jennifer: well ok sorry that your upset maybe next weekend...
> jennifer jennifer: do you think i may call sometime today please?
> dave_vds: upset?? why
> dave_vds: There is no reason for you to call, I asked them if they wanted to have a visit and they said they did not want to see you.
> jennifer jennifer: ok will i would still like to call them please
> jennifer jennifer: Ohh by the way di they get there gift's?
> jennifer jennifer: did*
> dave_vds: We got a box, but it did not contain what they asked for ,so I had it returned, should be in your mailbox again very soon. If you ask them what they'd like and then just put in some junk, then I will not pay for that and just have it sent back to you.
> jennifer jennifer: ok what are you saying that brandon didnt ask for a spider computer and kaitlynn didnt ask mommy for pretty's?
> dave_vds: no kaitlynn askt for a farm playmobil and  brandon for a tractor. lising to your kids
> jennifer jennifer: the only thing i couldnt send was the farm i could not find any..
> jennifer jennifer: I did davy
> dave_vds: no farm, no big tractor
> dave_vds: dont' promise if you can't give it
> jennifer jennifer: ok well at least the kids know that i sent them stuff
> jennifer jennifer: i did give it
> jennifer jennifer: thank for time and have great day..
> dave_vds: We'll have a great year, I can promise you i will return each and every favor you once gave me  You will not be seeing them at all in 2008 so I would say , have a great year

(R. 174-1, Respondent Aff. at ¶56.)  On January 4, 2008, the Court scheduled an evidentiary

hearing on the Petition for January 16, 2008.³ The Court further ordered Davy to appear for the evidentiary hearing, directing counsel to provide notice to Davy, which they did. (R. 162-1, Order of Jan. 4, 2008; R. 165-1, Order of Jan. 10, 2008; *see also* R. 168-1 (indicating contemporaneous personal service by email of Respondent's Proposed Findings of Fact and Conclusions of Law.) On January 16, 2008, Davy failed to appear for the evidentiary hearing, either in person or by counsel, and Jennifer opted to proceed by affidavits in lieu of oral testimony.⁴

## ANALYSIS

**I.    ICARA**

As noted above, Davy brought the current petition under ICARA. That statute entitles a person whose children have been abducted to the United States to petition in federal court for the return of the children. *Van De Sande*, 431 F.3d at 568; *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004) ("[t]he Hague Convention was enacted to 'secure the prompt return of children wrongfully removed to or retained in any Contracting State' and to 'ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" (quoting Hague Convention, art. 1, T.I.A.S. No. 11,670 at 4)). To

---

³    On January 10, 2008, Petitioner's counsel renewed his motion to withdraw, citing Local Rules 83.17 and 83.51.16. (R. 163-1, Renewed Motion to Withdraw.) The Court granted this motion, but conditioned dismissal on Petitioner's counsel agreement to provide notice to Davy of the scheduled evidentiary hearing and the Court's order that Davy personally appear. (*See* Tr. of Jan. 10, 2008.)

⁴    Jennifer offers her own affidavit as well as the affidavits of Raymond W. Sovsky, (Jennifer's father), Susan C. Sovsky (Jennifer's mother), Jayson Sovsky (Jennifer's brother), Heather Anderson (Jennifer's friend), Eric Campbell (a Deputy Sheriff in the Sheriff's Department of Lake County, Illinois), and Jerry Zabin (a Licensed Clinical Social Worker, who for more than twenty years has counseled perpetrators of domestic violence).

merit relief, a petitioner must establish, by a preponderance of the evidence, that his children were "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. §11603(e)(1)(A). A removal is considered wrongful when:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Koch v. Koch*, 450 F.3d 703, 712 (7th Cir. 2006) (citing Hague Convention, art. 3, T.I.A.S. No. 11,670, at 2); *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("A petitioner can establish that the removal of a child is 'wrongful' where: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal."); *Ruiz*, 392 F.3d at 1251 (same); *see also Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006) ("The convention is aimed at parties to custody battles who remove the child from the child's domicile to a country whose courts the removing parent thinks more likely to side with that parent."). The only element currently in dispute is the place of the children's habitual residence prior to their removal. A failure in proof on this element results in the denial of a petition. *See Ruiz*, 392 F.3d at 1251 n.1; *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); *Ruiz*, 392 F.3d at 1250 (the court's inquiry under the Convention and ICARA is limited to the merits of the abduction claim and not the merits of the underlying custody battle); *Koch*, 450 F.3d at 711 (under ICARA, the "court's task is to simply determine which country is the proper forum for that custody

determination").

If the petitioner establishes wrongful retention, then the burden shifts to the respondent to show that one of the exceptions to the return requirement applies. 42 U.S.C. § 11603(e)(2). In this case, Jennifer asserts that the applicable exception is set forth in Article 13b of the Convention, which provides that a child's return is not required if the respondent establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13b., *cited in Van de Sande*, 431 F.3d at 569. ICARA requires that Jennifer make this showing "by clear and convincing evidence." 42 U.S.C. § 11603(e)(2)(A). The Court will address the underlying claim and affirmative defense in turn.

## II. Habitual Residence

### A. The Scope of the Mandate

Before considering this issue on the merits, the Court first addresses a procedural point. A few days before the scheduled evidentiary hearing, Jennifer filed a "Notice of Intent To Contest the Issue of 'Habitual Residence,'" indicating that she intended to pursue a defense that she originally asserted in her answer. (R. 166-1, Respondent's Notice of Intent.) This request faces an initial hurdle, however, because certain language in the Seventh Circuit's prior opinion speaks to this issue:

> The two children of Davy and Jennifer Van De Sande, a married but estranged couple, *are habitual residents of Belgium*, Davy's native country. Davy has been awarded custody of his two children by a Belgian court, but Jennifer, who is living with the children in the United States, has refused to give them up. She became an "abducter" when Davy got the custody decree, though it was ex parte. Davy brought this suit to get the children back.

*Van De Sande*, 431 F.3d at 569 (emphasis added). If the emphasized language constitutes a

"conclusive determination" by the Seventh Circuit, then it "may not be reconsidered by the district court on remand." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005).

This limitation in a district court's authority "is based upon both the law of the case doctrine, which posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case, and the mandate rule, which requires a lower court to adhere to the commands of a higher court on remand." *Id.* (internal quotation and citation omitted). But both doctrines generally apply only when the issue on remand was already put squarely before the appellate court. *See Moore v. Anderson*, 222 F.3d 280, 283 (7th Cir. 2000) (because an appellate mandate only controls "as to matters within its compass," "[o]n remand, the district court retains the authority to dispose of other issues not addressed" (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168, 59 S. Ct. 777, 83 L. Ed. 1184 (1939))), *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 462 (7th Cir. 2007) ("Like the collateral estoppel doctrine, law of the case only applies where a court actually decided the issue in question."). Accordingly, "[t]he reach of the mandate is coextensive with the reach of [the appellate court's] holding, so 'observations or commentary touching upon issues not formally before the reviewing court do not constitute binding determinations.'" *Moore*, 222 F.3d at 283 (quoting *Creek v. Village of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998)); *see also Cameo Convalescent Center, Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986) (a "district court has the discretion to make a different determination of any matters that have not been taken to judgment or determined on appeal"). "To determine what issues were actually decided by the mandate, [] require[s] a 'careful reading of the reviewing court's opinion.'" *Moore*, 222 F.3d at 283 (quoting *Creek*, 144 F.3d at 445); *see also United States v. Parker*, 101

F.3d 527, 528 (7th Cir. 1996) ("the scope of the remand is determined not by formula, but by inference from the opinion as a whole.").

The critical question thus is whether "habitual residence" was at issue before the appellate court. It was not. In opposing summary judgment, Jennifer did not challenge Davy's *legal* argument that the children habitually resided in Belgium, choosing instead to take on only his argument that there was no "grave risk of harm." (R. 20-1, Resp. to Summ. J. at 1, 2, 6-11.) A careful reading of the Seventh Circuit's opinion reveals as much. Its comment on the children's habitual residence was not a "conclusive determination" – indeed, the parties did not even brief the issue on appeal – but simply a statement describing the case as the parties presented it in the district court. The mandate thus does not foreclose consideration of the children's habitual residence.

One other possibility could conceivably preclude consideration of "habitual residence" on remand: waiver in the district court. But this, too, is inapplicable. Conceding a legal argument by failing to respond to it on summary judgment does *not* forever close the door – a litigant may put only her best foot forward in response to summary judgment without fear of waiving legal arguments not presented. *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995) ("the only effect of a non-movant's failure to respond to a motion for summary judgment is that it constitutes an admission by the non-movant that there are no disputed issues of genuine fact warranting a trial; it does not constitute a waiver by the non-moving party of all legal arguments based upon those undisputed facts." (citing *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) and *Glass v. Dachel*, 2 F.3d 733, 739 (7th Cir. 1993))). Of course, failing to respond to summary judgment may carry adverse consequences in certain situations; for example, a

complete failure to respond could constitute forfeiture in the district court thereby foreclosing appellate court review of the merits. *See Scaife v. Racine County*, 238 F.3d 906, 907 (7th Cir. 2001) (failure to file a timely response to summary judgment did not prevent raising legal argument on appeal but "[t]he situation would be different if the district court had treated the plaintiff's failure to file a timely response as a waiver (more precisely, a forfeiture, *United States v. Richardson*, 238 F.3d 837, 841-42 (7th Cir. 2001)) and had therefore granted summary judgment without consideration of the merits, for that ruling if upheld would prevent us from considering the merits" (parentheses in original)); *cf. Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1220 (7th Cir. 1984) ("It is well-settled that an issue not presented in the court below cannot be raised for the first time on appeal and form a basis for reversal."). But that is not what happened here. Jennifer timely responded to summary judgment in the district court and argued (successfully) on appeal that reversal was appropriate because the evidence presented in support of her affirmative defense precluded summary judgment. *See also Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 173-74 (7th Cir. 1996) (on remand a party can advance arguments not pursued on appeal, provided they have not been previously waived in the district court). One other point is worthy of note: while Jennifer effectively conceded legal argument on "habitual residence" in response to summary judgment, she has disputed the factual issue since the beginning, including in her answer (R. 10-1, Answer at ¶8 (denying the allegation that the couple maintained their "permanent residence" in Belgium and "[f]urther answering, [that] [Jennifer] and Davy were not planning on living in Belgium on a permanent basis. Davy told her that they were going back to Belgium so that he could obtain a degree and then they would be returning to the USA")), and in response to Davy's Local Rule 56.1 statement (R. 20-1,

-14-

Resp. to Summ. J., Ex. 2 (responding to Petitioner's Local Rule 56.1 statement: "Jennifer denies that Belgium was hers or her children's permanent home . . ."). *Cf. Flynn*, 58 F.3d at 288. For all these reasons, Jennifer remains free to challenge "habitual residence" on remand.

Davy, however, may not contest this (or any other) issue because he has engaged in a course of conduct that gives rise to waiver. Since August 2008, he has persisted in violating this Court's order to return the children to Jennifer's custody. More recently, he has unilaterally cut off all of Jennifer's contact with her children and has failed to appear at an evidentiary hearing in a case *he initiated*. His intent is obvious. Having manipulated the litigation process to obtain *de facto* custody of the children, he has no longer feels compelled to obey orders of the Court. Such conduct creates the strong inference that, if he participated in the evidentiary hearing, the facts would have played out as Jennifer asserts. Regardless, it is conduct meriting the Court's finding that he has waived the opportunity to present evidence in support of the Petition, *see, e.g., Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31, 82 S. Ct. 1386, 1388-89 (1962); Fed. R. Civ. P. 37; Fed. R. Civ. P. 41(b), which is a sufficient ground to deny his Petition outright.

But even putting waiver aside, the Petition would fail. As a review of the complete record reveals, Davy has not established that the children were "habitual residents" of Belgium.

**B.     The Merits**

The term "habitual residence" is not defined in the Convention or in ICARA. *Koch,* 450 F.3d at 712. "'Habitual residence' sounds like 'domicile,' which in law refers to the place that a person considers to be his permanent home. But it is not domicile, and not only or mainly because a small child lacks the state of mind required for a determination of domicile so defined. Rather, because domicile is defined differently in different jurisdictions equating habitual

residence to domicile would re-raise the spectre of forum shopping by encouraging a parent to remove the child to a jurisdiction having a view of domicile more favorable to that parent's case." *Kijowska,* 463 F.3d at 586-87. "So, consistent with Congress's recognition of 'the need for uniform international interpretation of the Convention,' 42 U.S.C. § 11601(b)(3)(B), 'habitual residence' should bear a uniform meaning, independent of any jurisdiction's notion of domicile." *Id.* (citing *Koch*, 450 F.3d at 712).

In this regard, parental intent is informative here, *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001) ("The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration."), even if not necessarily so in all cases, *Kijowska,* 463 F.3d at 587 (in defining "habitual residence" "[t]he cases speak of the 'shared intent' of the parents, but that formula does not work when as in this case the parents are estranged essentially from the outset, the birth of the child (or indeed before)" (internal citation omitted; parentheses in original)). In addition, because "[t]he length of the child's residence in the country of one of the parents cannot be decisive," *id.*, and because "[t]he place of birth is not automatically the child's habitual residence," *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004), the issue of habitual residence remains open as to Brandon even though he was born and lived most of his life in Belgium. *See Delvoye v. Lee*, 329 F.3d 330, 334 (3rd Cir. 2003) (child born in Belgium was habitual resident of the United States because the mother "traveled to Belgium to avoid the cost of the birth of the child and intended to live there only temporarily"); *see also Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005) ("[C]ourts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." (quoting *Mozes*, 239 F.3d at

-16-

1079)).

The record evidence on this point weighs in Jennifer's favor. In addition to her own affidavit, Jennifer presents the uncontested affidavits of her father, mother, and brother all averring that Davy promised to bring Jennifer and Kaitlynn back to America after he completed school. For his part, Davy's summary judgment papers corroborate this contention somewhat. In his Local Rule 56.1 statements, he asserted that he and Jennifer "had discussed in general terms the possibility of relocating to the United States at some point in the future . . ." and also that part of the motivation to move to Belgium was "his desire to take classes." (R. 21-1, Petitioner's Resp. to SMF ¶6.) More importantly, Davy never presented any evidence – not in his verified petition, not in support of summary judgment, and not in his trial brief – countering Jennifer's assertion or supporting his claim that the children's habitual residence was Belgium. (*See, e.g.,* R. 1-1, Petition at ¶16 (stating without any supporting averments or other evidence that "[a]t the time of Kaitlynn's and Brandon's retention in the United States . . . their habitual residence . . . was Laakdal, Belgium").) Viewing the record as a whole, Davy has failed to establish that the children were habitual residents of Belgium, and thus his Petition does not merit relief because the children were not "wrongfully detained" under ICARA.

### III.    Grave Risk of Harm

Even if the children were habitual residents of Belgium, the Petition would fail because Jennifer has established her affirmative defense that the children face a "grave risk of harm." Indeed, as the Seventh Circuit already has noted, "[t]he affidavits paint a consistent and disturbing picture." *Van de Sande*, 431 F.3d at 569. They detail an extensive history of serious physical and verbal abuse (usually directed at Jennifer, but sometimes directed at Kaitlynn) that

-17-

often played out in front of the children. When coupled with Davy's threat to kill the children (*see* R. 172-1, Aff. of Dep. E. Campbell at ¶¶2, 8), this pattern of abuse clearly demonstrates that a grave risk of harm exists:

> Perhaps, standing alone, such a threat could be discounted as an emotional reaction to the prospect of losing custody of them. But given Davy's propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence, it would be irresponsible to think the risk to the children less than grave. The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes. The probability that Davy, or his mother, another person of violent temper (if the affidavits are true), would some day lose control and inflict actual physical injury on the children (or at least on the daughter) could not be thought negligible.

*Id.* at 570. The evidence upon which the Seventh Circuit relied in making this determination has remained effectively uncontroverted throughout the course of this litigation (Davy's argument in his post-remand trial brief was that Jennifer could not prove direct abuse of the children (*see* R. 83-1, Petitioner's Tr. Br. at 16-20)). Moreover, the chronology of events since remand gives no reason to question Jennifer's version of events. Accordingly, the Court concludes that Jennifer has established by clear and convincing evidence that a "grave risk" of harm exists for the children in Belgium.

**CONCLUSION**

For the above reasons, the Court finds that, by virtue of his course of conduct in this litigation, Davy has waived the opportunity to present evidence in support of the Petition. Even putting waiver aside, the Court has reviewed the entire record and finds that Davy has not established that the children were habitual residents of Belgium when Jennifer retained the children in 2004. In addition, Jennifer has proven by clear and convincing evidence that there is a "grave risk" that the children's return to Belgium would expose them to physical or psychological harm or otherwise place the children in an intolerable situation. The Petition is denied.

Dated: January 29, 2008                              ENTERED

_____
AMY J. ST. EVE
United States District Judge